Robert S. **BENHAM**, as Receiver of Manufacturers and Wholesalers Indemnity Exchange, Petitioner,

v.

John William **PRYKE**, as Lead Underwriter, personally and as Representative of those certain Underwriters at Lloyd's of London, Under Lloyd's Policies No. FTL001623 and FTL00945 and Cover Notes U73167A and U73167B; and Excess Insurance Co., Ltd., Respondents.

No. 85SC197.

Supreme Court of Colorado, En Banc.

Oct. 5, 1987.

Rehearing Denied Nov. 2, 1987.

Holmes & Starr, P.C., Kenneth L. Starr, Sidney W. DeLong, Denver, for petitioner.

Kenneth C. Groves, Philip A. Rouse, Jr., Denver, for respondents.

VOLLACK, Justice.

We granted certiorari to review the court of appeals' decision in *Benham v. Pryke*, 703 P.2d 644 (Colo.App.1985). The court of appeals held that under a reinsurance agreement, assessment liability coverage was available only for those subscribers with certificates of reinsurance that were valid on February 7, 1977, the date of the court-ordered assessment. We reject this analysis, but affirm the result reached by the court of appeals on other issues. We return the case to the court of appeals with directions to remand to the district court for a trial in accordance with the directions contained in this opinion.

I.

The Manufacturers and Wholesalers Indemnity Exchange [hereinafter M & W] was established in 1952 as an interinsur-ance exchange domiciled in Colorado and governed by sections 10–13–101 to –114, 4 C.R.S. (1973 & 1986 Supp.). As required by section 10–13–107, the M & W interinsurance exchange contract made each insurance exchange participant subject to an assessment equal to a maximum of one additional annual premium per policy if the assets of the exchange did not cover the claims against it for any twelve-month period. In order to protect themselves against the contingent liability of an additional assessment, various subscribers at M & W entered into a second contract [hereinafter the Master Agreement] with insurance underwriters or reinsurers at Lloyd's of London [hereinafter Lloyds] to provide optional assessment liability reinsurance [hereinafter ALR]. A designated attorney-in-fact was authorized to issue ALR certificates to subscribers. Participating subscribers who elected coverage received individual certificates which were generally renewable on an annual basis, although they could be issued for up to three years. Only an estimated two to three dozen subscribers, most in the Western International Group, out of hundreds participating in the insurance exchange, held three-year certificates. The voluntary nature of the ALR coverage resulted in policies with a wide range of expiration dates.[1]

Article 1 of the Master Agreement provided insurance coverage for "assessments made during the currency of this Agreement." It also required that:

Each Subscriber hereby reinsured shall first *pay or become liable to pay* in respect of losses arising from insured perils incurred during the twelve months ending on the declared date of assessment, an amount the equivalent of 100% of the annual premium payable by such Subscriber on insurance in force during the twelve months ending on the declared date of the assessment and *the Reinsurers shall then indemnify each*

---

1. The record does not reveal what percentage of M & W subscribers opted for ALR coverage, but a computer printout of hundreds of subscribers showed seventy-three different expiration dates for the first 147 policyholders. The largest number of policies expiring on any single day was seven. As a result, determining whether an additional assessment needed to be levied would have been an administrative and accounting nightmare, if calculated on an individual policy basis for the prior twelve months.

*Subscriber reinsured hereunder for liability incurred under any assessment so declared* up to the limit of liability provided for the individual Subscriber (after deducting all salvages and recoveries and all amounts due under other reinsurances) which is the excess over and above 100% of the Subscriber's annual premium aforesaid and *provided always that the said Subscriber has actually paid or become liable to pay such assessment.*

(Emphasis added.) The maximum liability of Lloyds for all claims under the Agreement was set at $1,250,000. Article 5 stated:

Definite claim for loss hereunder on Certificates issued during any annual period of this Agreement shall be made upon the Reinsurers within 12 months after each anniversary date of this Agreement.

In addition, Article 14 stated:

The authority granted to the Attorney in Fact by the Reinsurers hereunder to grant cover and issue certificates on their behalf shall remain continuously in force from the First day of January 1973, however, this Agreement may be terminated by the Reinsurers giving 30 days notice of cancellation to the Attorney in Fact. It is understood and agreed, however, that while the right to issue certificates as aforesaid will terminate on the of [sic] cancellation of this Agreement, all certificates issued prior to the termination of such authority shall not immediately expire on the date of such termination, but *shall remain in force until their natural expiration date* unless any or all such certificates become cancelled by the Attorney in Fact.

(Emphasis added). If M & W became insolvent, Article 18 of the Agreement provided in pertinent part:

In the event of the insolvency of the Exchange, this reinsurance shall be payable directly to the Exchange or to its liquidator, receiver, conservator or statutory successor *on the basis of the liability of the Exchange without diminution because of the insolvency of the Exchange* or because the liquidator, receiver, conservator or statutory successor of the Exchange has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator or *statutory successor of the Exchange shall give written notice to the Reinsurers* of the pendency of a claim against the Exchange indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurers *within a reasonable time after such claim is filed in* the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurers may investigate such claim and interpose, at their own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Exchange or its liquidator, receiver, conservator or statutory successor. . . .

(Emphasis added.) Although M & W could not produce any of the actual certificates at trial, the language that was to appear on the face of each certificate was attached to the Master Agreement and provided for:

reimbursement for assessment in accordance with the terms and conditions of the Master Agreement ... up to an amount equal to one annual premium provided that the Manufacturers and Wholesalers Indemnity Exchange shall have sustained losses from insured perils, during the twelve months immediately preceding the date of assessment, in excess of its earned premium income during the same period.

This Reinsurance is non-cancellable during the term of this Policy No. _____ to which it is attached.

By letter dated June 30, 1974, Lloyds notified M & W that it was cancelling the ALR coverage to take effect October 1, 1974. According to the Master Agreement, M & W subscribers could renew policies and new subscribers could sign up for ALR coverage until expiration of the ninety-day period. On December 1, 1975, the Denver District Court declared M & W insolvent and appointed the Colorado Commissioner of Insurance as receiver. On February 7,.

1977, the Denver District Court found that M & W had incurred losses exceeding its assets for the years 1974 and 1975, and authorized a levy of assessment up to one annual premium per policy against every M & W subscriber who was a member of the exchange for the twelve months preceding the declared dates of assessment of December 31, 1974, and December 15, 1975. When Lloyds refused to pay the assessment, the receiver filed suit against them in Denver District Court on April 18, 1977, seeking a court order for payment of the assessment. On motion by the defendant insurers, the trial court dismissed the complaint on July 22, 1980, finding that since the Master Agreement was terminated at the request of Lloyds on June 30, 1974, the 1977 assessment was not made "during the currency of the agreement" as required under the insurance contract.

The court of appeals reversed in *Benham v. Pryke*, 636 P.2d 1339 (Colo.App. 1981) [hereinafter *Benham I*]. It found that Article 14 of the Master Agreement, which stated that all certificates issued prior to termination of the agreement would "remain in force until their natural expiration date," notwithstanding the cancellation of the Master Agreement, meant that the agreement continued in effect. Citing *In re International Re-Insurance Corp.*, 32 Del.Ch. 471, 86 A.2d 647 (1952), *Benham I* stated in dicta that "[t]he subscribers could suffer no loss and the reinsurers could be under no liability until an assessment was made." 636 P.2d at 1341. It concluded that for the certificates at issue, coverage was perfected "only if an assessment is levied and reported within a policy term." *Id.* The case was then remanded for a determination of whether any certificates were in force at the time of the court-ordered assessment.

Apart from the instant case, the receiver had instituted actions against other M & W subscribers. The receiver settled with some of the subscribers for 40% of the assessment due with an agreement that the subscribers would assign the receiver the remaining 60% of their indemnity claim against the reinsurers. The receiver moved under C.R.C.P. 25(c) to be substituted for the subscribers in their indemnity claim against the reinsurers. The presiding district court denied the motion, ruling that the settling subscribers had no further claim against the reinsurers which could be assigned.[2]

Meanwhile, on remand to the district court under *Benham I*, the receiver moved for partial summary judgment on the ground that since some of the certificates issued prior to cancellation of the Master Agreement by Lloyds were still in effect in February 1977, the court-ordered assessment was within the "currency of the agreement," as required by Article 1. Lloyds countered with a motion to strike all prayers for relief against all subscribers other than fourteen listed by the receiver as having certificates in effect in 1977 (known as the Western International Group). Lloyds also filed a motion for summary judgment and sought attorney fees under section 13-17-101, 6 C.R.S. (1986 Supp.), contending that the receiver's claim was frivolous and in bad faith because the court of appeals in *Benham I* had clearly limited liability of the underwriters to only those few subscribers of the Western International Group. The trial court granted Lloyds' motions and awarded attorney fees.

In *Benham v. Pryke*, 703 P.2d 644 (Colo. App.1985) [hereinafter *Benham II*], the court of appeals reversed the grant of summary judgment and the district court's award of attorney fees. The court ruled that whether partial settlement of claims against the subscribers extinguished residual claims against Lloyds was a factual question to be determined at trial, not on motion for summary judgment. The court of appeals held that a computer list of subscribers attached to the receiver's motion for summary judgment was admissible evidence. It interpreted its decision in *Benham I* to limit the assessment liability

---

**2.** We denied certiorari on this issue: "Whether a district court ruling barring suit against a reinsurer for certain settled claims acted as res judicata in another suit against the reinsurer based both upon the settled claims and other unsettled claims."

coverage to the Western International Group. We granted certiorari only on the liability coverage issue, and we now reverse.

## II.

A reciprocal or interinsurance exchange such as M & W is defined as a

> system whereby individuals, partnerships, or corporations engaged in a similar line of business undertake to indemnify each other against a certain kind or kinds of losses by means of a mutual exchange of insurance contracts, usually through the medium of a common attorney in fact appointed for that purpose by each of the underwriters under agreements whereby each member separately becomes both an insured and an insurer with several liability only.

2 *Couch on Insurance* 2d § 18:11 (rev. ed. 1984). An interinsurance exchange differs from both stock and mutual insurance companies, because it is generally an association and not incorporated. Several state courts have concluded that the contingent liability of subscribers to make payments in addition to their premiums, in order to cover liabilities of the reciprocal exchange that exceed its assets, is analogous to the liability of stockholders of a new corporation for unpaid subscription costs. *Mitchell v. Pacific Greyhound Lines, Inc.*, 33 Cal.App.2d 53, 91 P.2d 176 (1939); *Fishback v. Lewis*, 170 Wash. 39, 15 P.2d 658 (1932).

Reciprocal exchanges became popular after World War I as a method whereby insurers banded together to spread among themselves the excess liability for catastrophic or similar types of claims. The technique was cost effective, since carriers did not pay premiums to third parties. The insurers could write additional policies using cash that otherwise would have been required to be retained as capital reserve funds. Much of the litigation concerning interinsurance exchanges arose in the 1930's when the exchanges went bankrupt and could not pay their policy claims.

3. In light of our determination based on the plain language of the Master Agreement, we need not discuss whether the agreement is one

The Supreme Court determined in 1937 that reinsurance was a contract of indemnity.[3] *Fidelity & Deposit Co. v. Pink*, 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937). Under an indemnity insurance policy, a reinsurer became liable only when the primary insurer had actually paid the claim and incurred the loss. If, because of insolvency, a primary insurer could not pay a claim, under the holding in *Pink*, a reinsurer was also no longer liable. To remedy this inequity, after 1937 state insurance regulators began to require by statute, rules, or practice that reinsurance agreements contain provisions that in the event of bankruptcy the reinsurer pay the liquidator or receiver of the primary insurer, based on the liability of the primary insurer. *See generally* 13A J. Appleman, *Insurance Law and Practice* § 7694 (1976); Nutter, *Reinsurance Issues in the Liquidation of Insolvent Insurers*, 18 Forum 290 (1983); Semple & Hall, *The Reinsurer's Liability in the Event of the Insolvency of a Ceding Property and Casualty Insurer*, 21 Tort & Ins.L.J. 407, 409 (1986). The Master Agreement between the M & W subscribers and Lloyds contains an insolvency provision in Article 18.

## III.

The receiver contends that the court of appeals erred in limiting reinsurance coverage only to the three-year certificates still in force at the time of the 1977 assessment, *Benham I*, 636 P.2d at 1341, although he agrees with the court of appeals that "the 'currency' of the agreement extended until the termination of outstanding reinsurance certificates, rather than until termination of the Master Agreement itself." *Id.* The receiver argues that this finding, that the currency of the agreement extended into 1977, supports the conclusion that the assessment occurred during the currency of the agreement and therefore assessment liability was effective for all ALR certificates valid during the currency of the agreement. We agree.

of indemnification or liability, or whether it is properly denominated "reinsurance" or "insurance."

Contracts must be interpreted in light of the intentions of the contracting parties, proven in some cases by the customary practices in the industry, by the language of the contract itself, and by the requirements imposed by state statute. *See Schnader v. Keystone Indem. Exchange,* 338 Pa. 405, 11 A.2d 887 (1940) (subscribers held liable for additional assessments because required by statute, even though interinsurance exchange contract expressly prohibited such assessments). By its clear language, the currency of the Master Agreement extended until the termination of the outstanding reinsurance certificates, rather than until the termination of the Master Agreement. Under Article 1 of the Master Agreement, the assessment must be made during the currency of the agreement. If the assessment is levied within that time, then the timing condition in the ALR contract is satisfied.

A court should not read into an insurance contract terms the parties never reasonably bargained for or agreed upon. *See Marez v. Dairyland Ins. Co.,* 638 P.2d 286, 289 (Colo.1981); *Jorgensen v. St. Paul Fire & Marine Ins. Co.,* 158 Colo. 466, 470, 408 P.2d 66, 68 (1965). Article 1 of the Master Agreement provides that the reinsurers shall "indemnify each Subscriber reinsured hereunder for liability incurred under any assessment ... provided always that the said Subscriber has actually paid *or become liable to pay* such assessment" (emphasis supplied). Article 1 clearly states that the reinsurers will indemnify covered subscribers not only against actual assessments paid but also against liabilities incurred under any assessment—a provision not unusual in reinsurance agreements. *See* W. Vance, *Handbook on the Law of Insurance* § 207, at 1069 (3d ed. B. Anderson 1951); *cf.* 13A J. Appleman, *Insurance Law and Practice* § 7695, at 546–47 (1976); 19 *Couch on Insurance* 2d § 80:65, at 671–72 (rev. ed. 1983). By the terms of the Master Agreement, the reinsurers must indemnify subscribers who were insured at the time they incurred assessment liability.

Therefore, in order to give a reasonable interpretation to the contract, we conclude that (1) the Master Agreement was current and in force on February 7, 1977, the declared date of assessment, and (2) that "during the currency of the agreement" means that coverage extended to all policies in effect during 1974 through December 15, 1975, the years in question.

The respondents suggest that we should follow the Delaware Supreme Court's decision in *In Re International Re–Insurance Corp.,* 32 Del.Ch. 471, 86 A.2d 647 (1952), which held that the reinsurer was not liable until the actual assessment was made, which occurred after the termination of the contract. We decline to follow this suggestion. The agreement in the case at bar is significantly different than the one in *International* and we feel compelled to interpret the language before us. The language of the agreement supports the conclusion that liability was incurred in 1974 and 1975, when the excess loss occurred, rather than in 1977 when the actual amount of loss was known. In addition, Article 18 of the Master Agreement required that the receiver notify the reinsurers "within a reasonable time" after the filing of a claim, which "would involve a possible liability on the part of the insurers." The "reasonable time" language must mean something longer than the twelve-month notification required of the exchange in Article 5.

General contract law also supports our conclusion. Any ambiguity in a contract should be construed against the drafter. *Coxen v. Western Empire Life Ins. Co.,* 168 Colo. 444, 448, 452 P.2d 16, 18 (1969). In this case, the reinsurance contract was drafted by Lloyds. Also, insurance contracts should be construed to uphold their purpose. *Columbian Nat'l Life Ins. Co. v. McClain,* 115 Colo. 458, 462, 174 P.2d 348, 350 (1946).[4] Our construction of the agree-

---

**4.** Under the interpretation urged by Lloyds, policyholders with annual certificates would never qualify for ALR coverage unless they renewed their policies. For example, for the first twelve months, subscribers paid premiums but received no coverage because the determination of whether claims exceeded assets of the ex-

ment, to extend coverage to all subscribers whose policies were in effect in 1974 and 1975, is in accord with the obvious purpose of the agreement to provide the subscribers with assessment liability insurance.

Accordingly, the judgment is reversed and the case remanded to the trial court for determination of what assessment is necessary to cover the loss event of all M & W subscribers who held valid ALR certificates under this agreement during the assessment years 1974 through December 15, 1975, in addition to those who held certificates whose effective period ending date was on or after the February 7, 1977, levy date.

We return the case to the court of appeals with directions to remand to the district court for a trial in accordance with the directions contained in this opinion.

change was based on a twelve-month calcula-