**E.D. THERIOT, Plaintiff,**

v.

**COLORADO ASSOCIATION OF SOIL CONSERVATION DISTRICTS MEDICAL BENEFIT PLAN, Defendant.**

**No. CIV. A. 90N2163.**

United States District Court, D. Colorado.

Feb. 18, 1999.

gator relied so heavily on the unsubstantiated note from Dr. Levy.

Thornton Walton Price, III, Dugan & Abadie, Durango, CO, for E.D. Theriot.

Timothy J. Parsons, David B. Seserman, Gorsuch, Kirgis, LLP, Denver, CO, for Colorado Ass'n of Soil Conservation Districts Medical Benefit Plan.

Peter R. Black, Traylor, Arnold, Tompkins & Black, P.C., Grand Junction, CO, for Lexington Ins. Co.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is an action to collect a money judgment for ERISA benefits, interest, and attorney's fees. After a trial to the court, on August 8, 1994, the court awarded Plaintiff E.D. Theriot ERISA benefits and interest against Defendant Colorado Association of Soil Conservation Districts Medical Benefit Plan. On April 6, 1995, the court awarded attorney's fees To execute the judgment in his favor, plaintiff filed a writ of garnishment against defendant's reinsurer, Garnishee Lexington Insurance Company [hereinafter "Lexington"]. The matter is before the court on (1) plaintiff's "Motion for Summary Judgment on Writ of Garnishment Issued to Garnishee Lexington Insurance Company" filed February 8, 1996, and (2) "Garnishee Lexington Insurance Company's Motion for Summary Judgment on Writ of Garnishment" filed February 16, 1996.

## FACTS

On December 14 and 15, 1992, plaintiff tried his ERISA case to this court. (Courtroom Mins. [filed Dec. 14–15, 1992].) Lexington was not a party to that action. Prior to trial, plaintiff and defendant stipulated that $161,161.91 represented the expenses associated with plaintiff's "psuedomembranous colitis, progressing to toxic megacolon, and for aftercare, prescription medications, and reconstructive surgery following the emergency removal of his colon" and that such amounts are "reasonable, customary, and necessary for treatment of [plaintiff's] medical condition." (Stipulation Concerning Evidence at Trial and Order ¶ 5 [filed Dec. 3, 1992].) In an Order and Memorandum of Decision filed August 8, 1994, the court made written findings of fact and conclusions of law. (Order and Mem. of Decision [filed Aug. 8, 1994].) Familiarity therewith is assumed. In that order, I found that defendant's cancellation of plaintiff's benefits was invalid. (*Id.*) I ordered defendant to pay plaintiff: (1) the benefits due to him under the ERISA plan, calculated as though his participation therein had never lapsed; and (2) pre-judgment interest calculated at the statutory rate provided in 28 U.S.C.A. § 1961, except for pre-judgment interest on his $125,000 loan which was to be paid at the market rate. (*Id.*) On August 9, 1994, judgment entered. (J. [filed Aug. 9, 1994].) On August 23, 1994, plaintiff moved for attorney's fees. (Pl.'s Mot. for Award of Attorneys' Fees and Br. in Supp. Thereof [filed Aug. 23, 1994].) On April 6, 1995, this court held a hearing on the matter and, in open court, awarded plaintiff $36,449.93 in attorney's fees. (Courtroom Mins. [filed Apr. 6, 1995] .) On April 11, 1995, judgment entered on the attorney's-fee award. (J. [filed Apr. 11, 1995].)

Defendant maintained excess loss indemnity insurance issued by Lexington. (Lexington's Br. in Supp. of Mot. for Summ. J. on Writ of Garnishment, Statements of Undisputed Material Fact ¶ 4 [filed Feb. 16, 1996] [hereinafter "Lexington's Br."]; *admitted at* Pl.'s Br. in Resp. to Lexington's Mot. for Summ. J. on Writ of Garnishment, Theriot's Resp. Concerning Undisputed Facts ¶ 4 [filed Mar. 14, 1996] [hereinafter "Pl.'s Resp."].) Lexington issued a total of four reinsurance policies to defendant, covering the period from April 1, 1987, through December 30, 1990. (Pl.'s Br. in Supp. of Mot. for Summ. J. on Writ of Garnishment Issued to Garnishee, Lexington Insurance Company, Statement of Undisputed Material Facts ¶ N [filed Feb. 8, 1996] [hereinafter "Pl.'s Br."]; *admitted at* Garnishee Lexington Insurance Company's Br. in Resp. to Pl. E.D. Theriot's Br. in Supp. of Mot. for Summ. J. on Writ of Garnishment, Resp. to Statement of Undisputed Material Facts ¶ N [filed Feb. 27, 1996] [hereinafter "Lexington's Resp."].) The reinsurance agreements are on Lexington's standard forms. (Pl.'s Br., Statement of Undisputed Material Facts ¶ O; *admitted at* Lexington's Resp., Resp. to Statement of Undisputed Material Facts ¶ O.) Defendant purchased the reinsurance coverage from so as to "protect the plan from depletion by catastrophic claims." (Lexington's Br., Statements of Undisputed Material Fact ¶ 22; *admitted at* Pl.'s Resp., Theriot's Resp. Concerning Undisputed Facts ¶ 22.) Lexington, as defendant's reinsurer, had no involvement in the adjustment of claims submitted by members of the ERISA plan, nor did it have any part in determining whether defendant would pay claims submitted by ERISA plan members. (Lexington's Br., Statements of Undisputed Material Fact ¶¶ 24–25; *admitted at* Pl.'s Resp., Theriot's Resp. Concerning Undisputed Facts ¶¶ 24–25.)

Defendant never paid plaintiff's money judgment, interest, or attorney's fees. (Lexington's Br., Statements of Undisputed Material Fact ¶ 18; *admitted in pertinent part at* Pl.'s Resp., Theriot's Resp. Concerning Undisputed Facts ¶ 18.) According to plaintiff, defendant is insolvent. (Pl.'s Br., Statement of Undisputed Material Facts ¶ L; *disputed at* Lexington's Resp., Resp. to Statement of Undisputed

Material Facts ¶ L.) On February 10, 1995, plaintiff filed a writ of garnishment, seeking service on Lexington, to recover the judgment entered by the court in his favor. (Writ of Garnishment—J. Debtor Other Than Natural Person [issued by D. Colo. on Feb. 10, 1995].) On March 24, 1995, Lexington filed its answer to plaintiff's writ. (Answer of Garnishee Lexington Insurance Company [filed Mar. 24, 1995].) On April 7, 1995, plaintiff filed a traverse to Lexington's answer. (Traverse to Answer of Lexington Insurance Company to Writ of Garnishment [filed Apr. 7, 1995].) Plaintiff seeks summary judgment on its writ of garnishment against Lexington. Plaintiff claims Lexington owes defendant a garnishable obligation under the Lexington-defendant reinsurance agreement. (Pl.'s Br.) Lexington argues that any liability it may have with respect to defendant is contingent and, therefore, not garnishable under Colorado law. (Lexington's Br.) Specifically, Lexington asserts that defendant failed to fulfill conditions of the reinsurance agreement and thus Lexington owes defendant no reinsurance payment. (*Id.*) Thus, argues Lexington, because it has no obligation to pay reinsurance to defendant, there is no debt which plaintiff can garnish. (*Id.*)

## ANALYSIS

### 1. Summary Judgment

Under rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). The moving party

bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in that party's own pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Only admissible evidence may be considered when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 [10th Cir.1990]).

### 2. ERISA Preemption & Rule 69 Execution

ERISA's preemption clause provides: "[e]xcept as provided in subsection (b) of this section, the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [governed by ERISA] ...." 29 U.S.C.A. § 1144(a) (West 1985). Rule 69 of the Federal Rules of Civil Procedure provides for execution of money judgments in the federal courts. The rule directs that "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held ...." Fed. R.Civ.P. 69(a). Plaintiff contends that his

garnishment action, because it seeks to enforce defendant's ERISA plan and receive benefits thereunder, "relates to" ERISA and is thus governed by ERISA rather than Colorado law. Lexington argues that Colorado garnishment law controls.

Whether ERISA preempts state law turns on Congress's intent in enacting the preemption clause. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987); *see also Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). A court must begin a preemption analysis with the presumption that "Congress did not intend to supplant state law." *Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. at 1676.

■ In *Travelers Insurance Company,* 514 U.S. at 656–58, 115 S.Ct. at 1677–78, the Supreme Court concluded, after reviewing the legislative history of ERISA, that Congress's aim in enacting the preemption clause was "to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." Similarly in *Ingersoll–Rand Company v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990), the Court found that Congress's goal was "to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." Thus, state laws which mandate employee-benefit structure or plan administration, or provide alternate enforcement mechanisms "relate to" ERISA plans and, consequently, are preempted under section 1144(a). *Travelers Ins. Co.,* 514 U.S. at 657, 115 S.Ct. at 1678. By contrast, state laws which have only an indirect economic influence on ERISA plans, and do not bind plan administrators in a particular way, preclude uniform administrative practice, or preclude provision of a uniform inter-

state benefit package, do not "relate to" ERISA plans within the meaning of section 1144(a) and, are not thereby preempted. *Id.* at 660, 115 S.Ct. at 1679; *see also Airparts Co. v. Custom Benefit Servs. of Austin, Inc.,* 28 F.3d 1062, 1065 (10th Cir. 1994) ("[I]f there is no effect on the relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—there is no preemption."); *Hospice of Metro Denver, Inc. v. Group Health Ins. of Okl., Inc.,* 944 F.2d 752, 754 (10th Cir.1991) ("When a state law does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the [law] has some economic impact on the plan does not require that the [law] be invalidated.") (internal quotations and citation omitted).

■ "[S]tate-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA . . . ." *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 833, 108 S.Ct. 2182, 2187–88, 100 L.Ed.2d 836 (1988). *Mackey* rejected an ERISA preemption argument in connection with garnishment of a principal ERISA entity. *See id.* at 834, 108 S.Ct. at 2188. Likewise, garnishment of a non-ERISA entity is not preempted by ERISA. *See id.,* 108 S.Ct. at 2187–88; *Airparts Co.,* 28 F.3d at 1065; *see also Union Health Care, Inc. v. John Alden Life Ins. Co.,* 908 F.Supp. 429, 435–36 (S.D.Miss.1995) (concluding that ERISA does not preempt employer's breach-of-contract claim against ERISA plan and its reinsurer); *Consumer Benefit Ass'n of the United States v. Lexington Ins. Co.,* 731 F.Supp. 1510, 1517 (M.D.Ala. 1990) (holding that ERISA does not preempt ERISA plan's claims against reinsurer for fraud and breach of contract). Thus, plaintiff's garnishment action does not "relate to" an ERISA plan within the meaning of section 1144(a). ERISA provides no enforcement mechanism by which plaintiff can execute his judgment. *See Mackey,* 486 U.S. at 833–34, 108 S.Ct. at

2187–88. Accordingly, pursuant to rule 69(a) and its reference to state law, I conclude that Colorado law governs execution of plaintiff's garnishment action.

### 3. Garnishment

■ A judgment-creditor may garnish a debt owed a judgment-debtor by a third-party. *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 778 F.Supp. 1116, 1122 (D.Colo.1991). Contingent liabilities are, however, not garnishable. *Haselden Langley Constructors, Inc. v. Graybar Elec. Co.,* 662 P.2d 1064, 1065 (Colo.1983) ("[A] judgment creditor [cannot] garnish sums which the judgment debtor [itself] could not recover from the garnishee."). Lexington argues that any obligation which it may owe defendant is contingent on defendant's fulfillment of various contract provisions and is therefore not garnishable by plaintiff. Specifically, Lexington asserts that any liability it owes defendant is contingent because defendant failed to fulfill two conditions precedent of the reinsurance agreement: (1) proof of payment; and (2) notice. Whether Lexington's obligation to defendant is contingent turns on the terms of the Lexington-defendant reinsurance agreement.

### a. Contract Interpretation under Colorado Law

■ The Lexington-defendant reinsurance agreement is a contract and thus should be construed in accordance with the principles of contract law discussed herein. *See Emenyonu v. State Farm Fire and Cas. Co.,* 885 P.2d 320, 323 (Colo.Ct.App. 1994) (citing *Chacon v. American Family Mut. Ins. Co.,* 788 P.2d 748 [Colo.1990] ). Under Colorado law, the interpretation of a contract is generally a question of law for the court. *See Smalley & Co. v. Emerson & Cuming, Inc.,* 808 F.Supp. 1503, 1514 (D.Colo.1992) (citing *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371, 374 [Colo. 1990] ), *aff'd,* 13 F.3d 366 (10th Cir. 1993); *Holland v. Board of County*

*Comm'rs,* 883 P.2d 500, 505 (Colo.Ct.App. 1994) (citing *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748, 750–51 [1978] ). The primary goal of contract interpretation is to determine and give effect to the intent of the parties. *Cache Nat'l Bank v. Lusher,* 882 P.2d 952, 957 (Colo.1994) (en banc). "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation. Each word in an instrument is to be given meaning if at all possible." *United States Fidelity & Guar. Co. v. Budget Rent–A–Car Sys., Inc.,* 842 P.2d 208, 213 (Colo.1992) (citations omitted); *see also Colowyo Coal Co. v. City of Colo. Springs,* 879 P.2d 438, 445 (Colo.Ct. App.1994) (stating that a court must construe the parties' agreement "as a whole ... so as to give effect to each of its provisions") (citation omitted). A written contract which is complete and free from ambiguity represents the objective intent of the parties and will be enforced according to its plain language. *See Board of County Comm'rs v. E–470 Pub. Highway Auth.,* 881 P.2d 412, 420 (Colo.Ct.App. 1994) (citing *In Matter of Water Rights of May,* 756 P.2d 362, 369 [Colo. 1988] ), *aff'd in part and rev'd in part on other grounds sub nom. Nicholl v. E–470 Pub. Highway Auth.,* 896 P.2d 859 (Colo.1995); *see also Omnibank Parker Rd., N.A. v. Employers Ins. of Wausau,* 961 F.2d 1521, 1523 (10th Cir.1992) ("Unambiguous contract provisions must be construed to give effect to their plain meaning."); *Cache Nat'l Bank,* 882 P.2d at 957. However, "[i]f the court determines a contract is ambiguous and its construction depends on extrinsic evidence, then the interpretation of the contract becomes a question of fact." *Stegall v. Little Johnson Assocs., Ltd.,* 996 F.2d 1043, 1048 (10th Cir.1993) (citations omitted).

■ Whether a contract term is ambiguous is a question of law. *Smalley & Co.,* 808 F.Supp. at 1514; *Fibreglas Fabricators, Inc.,* 799 P.2d at 374. "Under Colorado law, to determine if a particular

term is ambiguous, 'the language of the agreement must be constructed by application of the accepted meaning of the words with reference to all of its provisions. The nature of the transaction which forms the contract subject matter must also be considered.'" *Stegall*, 996 F.2d at 1048 (quoting *In re Marriage of Thomason*, 802 P.2d 1189, 1190 [Colo. Ct.App.1990]). "Contractual terms are not rendered ambiguous merely because the parties subsequently urge diverse interpretations." *Stichting Mayflower Recreational Fonds v. Newpark Resources, Inc.*, 917 F.2d 1239, 1246–47 (10th Cir.1990). Rather, a contract is ambiguous where the text of the agreement reasonably allows for varying interpretations. Unless there is an ambiguity in its terms, a court should avoid strained interpretations, give effect to the terms according to their ordinary meaning, and enforce the policy as written. *State Farm Mut. Auto. Ins. Co. v. Graham*, 860 P.2d 566, 568 (Colo.App.1993) (citations omitted). Plaintiff and Lexington disagree over whether the payment and notice provisions of the reinsurance agreement are conditions precedent to the payment of reinsurance thereunder.

### b. Conditions Precedent—Reinsurance Treaties versus Reinsurance Policies

■ Plaintiff argues that in order for a provision to be construed as a condition precedent, such "'intention must be clearly and unequivocally stated in the contract.'" (Pl.'s Reply at 9 [quoting *Security Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 976 (10th Cir.1976)].) *Security Mutual Casualty Company*, 531 F.2d at 976, a case involving a notice provision in a reinsurance treaty, established the "clearly and unequivocally stated" rule on which plaintiff relies. "Reinsurance treaties and reinsurance policies are not synonymous, the first being contracts for insurance, and the latter being contracts of insurance." 13A John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 7681 at 483 (1976). Although

the "for insurance" and "of insurance" distinction is not particularly illuminating, differences between treaties and policies can be explained. A reinsurance treaty is a "bilateral contract containing mutual covenants." *Security Mut. Cas. Co.*, 531 F.2d at 977. Typically in a treaty arrangement, the reinsurer agrees to accept all or a part of the reinsured's risks in exchange for a portion of the premiums paid to the reinsured. *Id.* (citing 13A Appleman & Appleman, *Insurance Law and Practice* § 7681). In contrast, a reinsurance policy typically is "unilateral in nature.... The entire relationship is based upon a promise and a condition." *Id.* at 977 (citing 3A *Corbin on Contracts* § 731 [1960]); *see Fortress v. Jefferson Ins. Co. of New York*, 465 F.Supp. 333, 336 (E.D.N.C.1978) (contrasting treaties and policies and discussing *Security Mutual Casualty Company*, 531 F.2d at 977). A reinsurance policy is a promise by the reinsurer to "pay a sum of money upon the happening of an ... event, conditioned upon the payment of premiums by the [re]insured. The [re]insured makes no return promise to pay the premiums and the other duties placed on the [re]insured are usually stated as conditions rather than promises." *Id.* at 977 (citing 3A *Corbin on Contracts* § 731 [1960]).

■ The language of the Lexington-defendant reinsurance agreement indicates that the agreement is a reinsurance policy and not a reinsurance treaty. The agreement is entitled "EXCESS LOSS INDEMNITY POLICY" and states: "[i]n consideration of the payment of premium, the statements in the application ... and subject to the terms, conditions, and limitations of this Policy, Lexington ... does insure [defendant]." (Lexington's Br., Ex. 2 [Lexington-defendant reinsurance agreement].) Thus, the agreement indicates a promise by Lexington to pay reinsurance, provided that defendant pays the agreed-upon premiums and abides by the agreement's provisions. Nothing in the agreement evidences mutual covenants in-

dicative of a reinsurance treaty. Thus, I conclude that the Lexington-defendant reinsurance agreement is best characterized as a reinsurance policy. Accordingly, *Security Mutual Casualty Company* does not control.

### c. Payment Provisions of the Reinsurance Agreement

 I next consider the agreement's language regarding payment and notice to determine whether defendant complied therewith and triggered Lexington's obligation to pay reinsurance. *See Fidelity & Deposit Co. of Maryland v. Pink,* 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937) (construing reinsurance agreement based on its particular terms); *Allemannia Fire Ins. Co. of Pittsburg, Pa. v. Firemen's Ins. Co. of Baltimore,* 209 U.S. 326, 28 S.Ct. 544, 52 L.Ed. 815 (1908) (same). The reinsurance policy includes definitions and terms specific to proof of loss and proof of payment. (Lexington's Br., Ex. 2 [Lexington-defendant reinsurance agreement].) The terms indicate that Lexington's obligation to pay reinsurance to defendant arises upon payment by defendant of benefits to an ERISA-plan participant. In addition to the general "subject to the terms, conditions, and limitations" language which governs the entire agreement, the specific terms of the policy indicate that Lexington and defendant contemplated actual payment by defendant before Lexington becomes obligated to pay anything. The agreement provides that "BENEFIT PLAN PAYMENTS ON AN INCURRED AND PAID BASIS means, for a Policy Year, the total amount of benefits to which ... Covered Persons [such as plaintiff] become entitled under the Plan subject to any limitations of this Policy. Such amount of benefits shall only include the Eligible Expenses incurred on or after the Effective Date of this Policy *and paid* during the Policy Year ...." (Lexington's Br., Ex. 2 [Lexington-defendant reinsurance agreement (italics added) ].) The agreement defines "ELIGIBLE EXPENSES" as "the charges which are cov-

ered *and* paid under the Plan subject to any limitations of this Policy." (*Id.,* Ex. 2 [Lexington-defendant reinsurance agreement (italics added) ].) Further, the section enumerating "SPECIFIC EXCESS INSURANCE" states that "[Lexington] will pay, subject to the terms, conditions and limitations of this Policy, the Specific Excess Benefit, if any, to the [defendant] within sixty (60) days after acceptance by [Lexington] of the proof of loss *and* proof of payment of benefits under the Plan." (*Id.,* Ex. 2 [Lexington-defendant reinsurance agreement (italics added) ].) All three contract provisions above require that losses be incurred *and* paid. This language reveals that the reinsurance agreement obligates Lexington to pay defendant—and thus to owe a garnishable liability—only upon defendant's actual payment of ERISA-plan benefits to a plan participant. In particular, the "Specific Excess Insurance" language indicates that Lexington must pay only after receiving both proof of loss *and* proof of payment. To conclude, as plaintiff suggests, that the Lexington-defendant reinsurance agreement does not require actual payment by defendant to trigger Lexington's obligation to pay reinsurance would ignore the plain language and meaning of the reinsurance policy in contravention of established principles of contract interpretation. The insurance policy does not insure against the reinsured's insolvency.

Contrary to plaintiff's argument, *Benham v. Pryke,* 744 P.2d 67 (Colo.1987) (en banc), and *Bluewater Insurance Limited v. Balzano,* 823 P.2d 1365 (Colo.1992) (en banc), do not require a different result. Plaintiff claims that, following *Benham* and *Bluewater Insurance Limited,* a Colorado court would require a reinsurer to pay reinsurance regardless of the reinsured's ability to pay the underlying claim. (Pl.'s Resp. at 10.) Those cases, however, do not lend themselves to such a broad reading as both turned on the specific language of the agreements at issue. *Benham* involved contract provisions quite

different from those in the Lexington-defendant reinsurance agreement. The *Benham* agreement "clearly state[d] that the reinsurers will indemnify covered subscribers not only against actual assessments paid but also against liabilities incurred under any assessment." *Benham,* 744 P.2d at 72. Thus, actual payment by the reinsured was not required to trigger the reinsurer's obligation to pay reinsurance. The *Benham* court noted that a contract term triggering reinsurance based on assessments paid and liabilities incurred is "not unusual in reinsurance agreements." *Id.* (citations omitted). The Lexington-defendant reinsurance agreement contains no such provision. Nothing in the Lexington-defendant reinsurance agreement indicates that Lexington has any obligation to pay reinsurance where defendant incurs a liability—*i.e.* a judgment—but does not actually pay the claim. Additionally, the reinsurance agreement in *Benham* contained an express insolvency clause. That clause provided that, in the event that the reinsured became insolvent, the reinsurer remained obligated to pay reinsurance to the reinsured's successor-in-interest, regardless of whether the reinsured actually paid any of the claim giving rise to the reinsurer's obligation. The Lexington-defendant reinsurance agreement contains no similar provision. In *Bluewater Insurance Limited,* the reinsurance agreement at issue expressly provided that in the event of the insolvency of the reinsured, reinsurance would be payable to the reinsured's successor-in-interest "on the basis of the liability of the [reinsured] without diminution because of the insolvency of the [reinsured]." *Bluewater Ins. Ltd.,* 823 P.2d at 1368. As noted above, the Lexington-defendant reinsurance agreement does not provide for payment upon defendant's inability to pay.

The Supreme Court has also construed reinsurance agreements in *Pink* and *Allemannia Fire Insurance Company.* Those cases illustrate that reinsurance agreements are not subject to a single interpretation simply because the subject matter of

the agreement is reinsurance. It is, rather, the specific terms of an agreement which determine the reinsurer's obligation to pay. *See Pink,* 302 U.S. at 229, 58 S.Ct. at 164 ("[L]iability under any written contract must be determined upon consideration of the words employed."); *Allemannia,* 209 U.S. at 331–32, 28 S.Ct. at 546 ("The only question before the [C]ourt is ... the construction of the language of the reinsurance compact."). In *Allemannia,* the Court concluded, based on the language of the agreement, that the "claim of the reinsured rests upon its liability to pay its loss to the original insured, and is not based on the greater or less[er] ability to pay by the reinsured." *Allemannia,* 209 U.S. at 332, 28 S.Ct. at 546. In *Pink,* the Court noted the outcome of *Allemannia,* but concluded that such a result did not control in that case because the language of the reinsurance agreement at issue differed from that in *Allemannia.* In *Pink,* the agreement required "proof of payment," and thus the insolvent reinsured's inability to pay precluded recovery under the reinsurance agreement *Pink,* 302 U.S. at 229, 58 S.Ct. at 164. The Lexington-defendant reinsurance agreement contains similar terms which requires payment by the reinsured.

I conclude that proof of payment of loss by defendant is a condition precedent to Lexington's obligation to pay reinsurance to defendant. Because defendant cannot produce proof-of-payment, Lexington's obligation to defendant is contingent, and contingent obligations are not garnishable. *See Haselden Langley Constructors,* 662 P.2d at 1065. Plaintiff's garnishment claim against Lexington therefore fails. I need not reach the parties arguments regarding notice.

### 4. Public Policy

Plaintiff asserts that any provision of the Lexington-defendant reinsurance policy which would allow Lexington to avoid coverage because of defendant's

inability to pay his judgment is void as against public policy. He fails, however, to provide any argument to support his assertion. " '[B]efore ... a contract can be declared illegal upon the ground that it is against public policy, it must clearly appear that it is obnoxious to the pure administration of justice, or manifestly injurious to the interests of the public.' " *Superior Oil Co. v. Western Slope Gas Co.,* 549 F.Supp. 463, 468 (D.Colo.1982) (quoting *Wood v. Casserleigh,* 30 Colo. 287, 71 P. 360, 361 [1902]), *aff'd* 758 F.2d 500 (10th Cir.1985); *see also Deines v. Vermeer Mfg. Co.,* 752 F.Supp. 989, 997 (D.Kan.1990) (stating that an agreement is against public policy if it is "injurious to the interests of the public, contravenes some established interest of society, violates some public statute, or tends to interfere with the public welfare or safety") (citations omitted). A provision of an insurance contract which attempts to dilute, condition, or unduly limit statutorily mandated coverage may be declared against public policy and therefore void and unenforceable. *See, e.g., Aetna Cas. & Surety Co. v. McMichael,* 906 P.2d 92, 100 (Colo. 1995) (citations omitted). Generally, public policy may be derived from state statutes and from legal precedent. *See Farmers Ins. Exch. v. Dotson,* 913 P.2d 27, 30 (Colo.1996); *Allstate Ins. Co. v. Juniel,* 931 P.2d 511, 516 (Colo.Ct.App. 1996).

Plaintiff does not argue, nor is it apparent to the court, that ERISA or Colorado law mandates reinsurance policies for ERISA plans. Therefore, it is not possible that the Lexington-defendant reinsurance policy impermissibly alters statutorily mandated coverage. Colorado does regulate reinsurance agreements. *See* Colo.Rev.Stat. § 10–3–118 (1994 & Supp. 1996). The statute provides that "[n]o credit shall be allowed, as an asset or a deduction from liability, to any ceding insurer for reinsurance [ ] [u]nless the reinsurance is payable by the reinsurer while in force on the basis of the contractual liability of the ceding insurer under the contracts reinsured without diminution due to the insolvency of the ceding insurer." Colo.Rev.Stat. § 10–3–118(3)(b) (1994). This so-called "insolvency clause" was added to many insurance codes to prevent the insolvency of the reinsured to allow the reinsurer to avoid paying reinsurance. *See Bluewater Ins. Ltd.,* 823 P.2d at 1371 (citing *Benham,* 744 P.2d at 71). Plaintiff cites no authority, and none is apparent to the court, indicating that Colorado law mandates an insolvency provision in every reinsurance agreement or that, as written, the Lexington-defendant reinsurance agreement violates Colorado law. The Colorado statute applies only where a reinsured seeks credit for the reinsurance. Plaintiff offers no evidence that defendant sought or received such credit.

Public policy favors enforcing agreements as written. *See Emenyonu,* 885 P.2d at 323. Freedom of contract and enforcing agreements between commercial entities is "one of the essential freedoms of citizenry." *Superior Oil Co.,* 549 F.Supp. at 468, *aff'd,* 758 F.2d 500. Thus, "[u]ntil fully and solemnly convinced that an existent public policy is clearly revealed, a court is not warranted in applying that principle of public policy to void a contract." *Id.* Plaintiff has provided no authority, and none is apparent to the court, which indicates that, under the circumstances of this case, the reinsurance policy is void as against public policy. Interpreting the Lexington-defendant agreement in accordance with its terms, although it produces an unfortunate outcome for plaintiff, is not "obnoxious to the administration of justice" or "manifestly injurious" to the public interest. I therefore conclude that construing the Lexington-defendant reinsurance policy in accordance with its terms does not render it void as against public policy.

### 5. *Conclusion*

Based on the foregoing, it is therefore ORDERED that

1. Plaintiff's motion for summary judgment is DENIED.

2. Lexington's motion for summary judgment is GRANTED. The writ of garnishment against Lexington is hereby DISMISSED.